Due to technical difficulties, we are unable to provide the entire audio recording in this case from showcasing and from selling their animals within the store. The amendments to the ban, however, made it even more clear that the true purpose of the ban was to foreclose those large out-of-state USDA-licensed breeders and brokers from conducting business within the state to the exclusion of the local Maryland breeder. And the practical effect of the ban is that all out-of-state breeders and brokers of dogs are no longer permitted to sell their household pets in face-to-face sales within the state of Maryland. This is the primary distinction from any other local ordinances or the other four statewide bans that have gone into effect across the country under similar pretenses. To understand that distinction, I'd like to spend a quick minute going over the statutory construction of the ban that is currently in effect in the state of Maryland. That ban is codified under Mailing Code of Business Regulations 19-701-705, and your honors can find the text of that ban at JA-401. At base, the statute states that a retail pet pet store becomes problematic here. Under the ban, a retail pet store means a for-profit establishment that sells or offers for sale domestic animals to be kept as household pets or a broker. Taken out of that definition from the prior ban in 2018 was the clause open to the public, which was utilized by the traditional pet stores in order to continue conducting business under the 2018 ban. But by eliminating the phrase open to the public, the legislature risked putting out of business those local Maryland breeders that it sought to protect because they would therefore fall under the definition of a retail pet store. To combat that issue, the legislature inserted an exclusion into the definition of retail pet store, stating that a retail pet store does not include an establishment at which the animals sold at the establishment were born at the establishment. And that phrase, which is extremely broad, allows those local Maryland breeders to continue to operate. And that also allows out-of-state breeders to sell at their establishment if the animals were born there, correct? It allows the out-of-state breeders to sell their establishments out-of-state, but it forecloses those out-of-state breeders from those face-to-face transactions in Maryland, which is the critical distinction from any of the other statewide bans or any of the local ordinances here. There is now no avenue for an out-of-state breeder to sell their dogs in the state of Maryland face-to-face to the Maryland consumer, which is critical. That face-to-face part is important in what you just said, right? Because they can sell online. Correct, John. We can see that they can sell online, sight unseen the dogs, but these are household pets we're talking about. And that face-to-face sale is what is critical here and what differentiates it from other statutes. The other part of this definition of retail pet store that is critical is it now includes a broker. And a broker is broadly defined as a person who transfers dogs or cats for resale by another person. So any broker is precluded from selling their animals within the state of Maryland. That's brokers in Maryland and brokers outside of Maryland, right? Correct, Your Honor. That is our position. And that is because it is a broadband across all brokers. But Your Honor makes a good point that while on its face, it seems to apply even-handedly to out-of-state versus in-state brokers. And I'd like to jump into the Dormant Commerce Clause argument in that regard, Your Honor. Under the Dormant Commerce Clause, appellants not contend that the 2021 ban is discriminatory on its face. Of course, it seems to wield even-handedly regarding brokers. However, as to the effect on brokers, Your Honor, the apologies, it seems to apply even-handedly to brokers on its face. However, as alleged in our complaint, there are no brokers within the state of Maryland. There are only out-of-state brokers. And that is because the definition of broker under Maryland Retail Pet Store Ban is nearly identical to the definition of broker under the USDA Animal Welfare Act licensing structure. So, any Class B dealer, which is also a broker under the USDA licensing structure, is also a broker under Maryland's definition. And we know that there are no Class B dealers or brokers within the state of Maryland. So, regarding discriminatory effect as to brokers, because there are no in-state brokers, the effect of the ban is to preclude only out-of-state brokers from the Maryland market. And regarding breeders, as far as discriminatory effect is concerned, the Supreme Court has stated that states cannot require an out-of-state firm to become a resident in order to compete on equal terms. And as far as out-of-state breeders are concerned, that is precisely what the Retail Pet Store Ban would require. Because of the extremely opportunity for those out-of-state breeders to sell their puppies face-to-face with a Maryland consumer within the state. But you agree that this argument, you know, for a breeder in Missouri, or a breeder in New York State, or California, you know, this means they may not see a lot of Maryland customers. But for a breeder in Virginia, just over the border, or in Pennsylvania, just over the border, this may not really change how many Maryland customers they make or they see. It seems to be kind of geographically dependent, right? Your argument's not that the state is imposing a tax, or the state is requiring you to file, you know, for a business license in Maryland. It's not requiring you to establish residency or anything to do business. Your argument's just, it's harder for people far away to sell their product to people who live in Maryland. A couple comments to that, Your Honor. I believe that's the long-distance commerce argument that was made by the lower court, and I believe in the state's briefing as well. I think that ignores the unequal footing that any out-of-state breeder, whether they're located in New York, or Virginia, or Missouri, are on unequal footing than those in-state breeders, because of the ability to sell in those face-to-face transactions in Maryland. Like I said, the Supreme Court says you can't require an out-of-state firm. Yes, sorry, Your Honor. What's the benefit of having an in-state transaction in Maryland? If you live just over the border, if I'm a breeder who lives just across the border in Virginia, why, you said it prevents all of them from having that benefit. Well, the facts in this case, Your Honor, are that those breeders are located far away. The facts in the case are that those big USDA licensed breeders are in the Midwest, and that's where those dogs are coming from. But the benefit of those face-to-face sales in Maryland, and the legislature harped on this, in fact. Senator Kramer, before the committee hearing, stated, we're looking to say, you know what, in the state of Maryland, if you want to adopt, or if you want to breed a specific dog, then do so from a local breeder that actually cares about their breeding dogs. They'll meet you, get to know who you are, get to know who they are, meet the dogs of the parents on site. That face-to-face distinction is critical here, and the legislature, even beyond the committee transcripts, acknowledged how important that face-to-face transaction is in the 2018 ban, when they spoke about the legislature's intent to allow the local Maryland breeders to still showcase within retail pet stores. Now, of course, that's been eliminated in the 2021 ban because of statements made by the lower court regarding the efficacy of that language. But Your Honor is correct that that face-to-face distinction is critical, and I think that that's ignored in the long-distance commerce argument. To be fair, it's critical to the, in your argument, it's critical to the breeders who want to send their dogs to good homes. In this legislative history, there's something for everyone, where they talk about the face-to-face being important, but then they allow for online sales, both within Maryland and outside of Maryland. So it's not actually clear whether it or not, but I don't know that that's properly our concern, whether they're actually going to accomplish the goals of their legislation. Only one half of the balancing, and the other half really requires you to show some out-of-state burdens. Sure, Your Honor, and it does go to the discriminatory purpose behind the ban, which we do contend that discriminatory purpose alone could satisfy a violation of Dormant Commerce Clause finding. I did also want to point out, you referenced other methods of operation or change in business operations that can still sell on the internet. And the lower court relied heavily on the Exxon case, which I'm sure Your Honor is familiar with, but that case involved the out-of-state gasoline suppliers. They were not allowed to sell their gasoline to their own retail stores within the state. And the court there held that a change of method of operation alone is insufficient to satisfy a violation of Dormant Commerce Clause. But here, there is reason to believe that that market gap by the closing of the retail pet stores and disallowing those out-of-state breeders and brokers from face-to-face sales within Maryland, that that gap will be filled by in-state versus out-of-state because of the And to briefly touch on the Pike Balancing Test, Your Honors. Again, this case was dismissed on an early stage, motion to dismiss. The appellants were not afforded an opportunity to conduct any discovery. In Hazel 1, the court, which was before this court in the Fourth Circuit, this court made clear that it's a fact-intensive nature that counsels against premature dismissal. The court really needs to look at the burden imposed on commerce versus those relation to the local benefits. Even the lower court acknowledged the flawed nature of this band, the fact that at least Maryland consumers with fewer options and protections than they previously had to obtain dogs. And for those reasons, what appellants are looking towards is a reversal of the motion to dismiss in order to conduct discovery and to be able to develop a full record for the Pike Balancing analysis, which has been done in numerous other cases, including the Maine versus Taylor case that we cited in our briefing that allowed discovery calling of expert witnesses on Pike Balancing. I'd like to also briefly turn to my preemption argument, which is really one of conflict or subset obstacle preemption. It is appellant's position that a state law is preempted if it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. Those purposes and objectives of Congress are set forth in the Animal Welfare Act's congressional statement of policy. Appellants allege that the purpose of the Animal Welfare Act and is set forth in that statement of policy is to regulate animals and their activities in interstate commerce, which is precisely what the area in which the 2021 ban is operating. The lower court relied heavily upon the savings clause set forth in the Animal Welfare Act, which appellants allege is silent as to the purchase and sale of animals. The savings clause specifically calls for promulgating standards in addition to those Yes, your honor. Do you agree that the regulation of pets is within the state's traditional police powers? I believe that the state's traditional police power does include animal welfare, but as far as the purchase and sale, I do believe that the Animal Welfare Act does specifically regulate in that area and because the savings clause is silent. That's true that Congress is regulating that area, but usually we think when something is within a state's traditional police power, it's only preempted to the extent that Congress has spoken expressly. Congress has said this is going to become a federal issue in these specific ways. So you seem to be reading the savings clause to say if Congress hasn't given it to the state, the state doesn't have the power. Whereas if it's a traditional state police power, the question is actually did Congress take it from the state and if it didn't, we assume the state still has that power. Understood your honor, but at that point, then you must look at the actual conflict between the state ban and the Animal Welfare Act, which we allege the conflict is that no class B dealer is permitted to conduct business in the state of Maryland at all. I see time is up, unless your honor would like me to continue. What discovery would you be focused on? I'm sorry, your honor, a little difficult in the remote context. There's the discovery. What discovery would you be interested in and to which claims or counts would it relate to if anything other than the Commerce Clause? Understood your honor, it would be towards the Commerce Clause and the pike balancing analysis specifically as well as the discriminatory effect. The ban has been in effect for over a year now. It's our allegation that there is data to be collected as far as where these dogs actually coming from that are filling in the market gap. Are they still coming in from out-of-state breeders and brokers, in which case, you know, we don't necessarily have a case, but it's our contention that that market gap is being filled by those local Maryland hobby breeders as contemplated by the legislature. So we would, you know, hire expert economists to study that. We'd also like the ability to set forth by the state, you know, and the efficacy of those, because they do have to be beyond speculative as set forth again in that Hazel 1 case. And we not only believe that they're speculative, but that they are based on false premises that can be proven false in discovery. Thank you, your honors. Thank you very much. Mr. Dietrich. Good morning, your honors, and may it please the court. There are two issues at issue here, which is the preemption case and the dormant commerce clause issue. I'll move to the preemption issue first. So the supremacy clause invalidates laws, federal laws, or state laws that interfere with or conflict with federal laws. And I think that we have to keep in mind some of the fundamental principles that underlie that analysis, which is the presumption against preemption, as we've talked about. When we have something that occupies or legislates in the area that's traditionally occupied by the states, there is a strong presumption against preemption, and that's what we have here. So when we're looking at obstacle preemption or conflict preemption, we're looking at two things, the purpose of the laws and the methods by which the federal law seeks to achieve its objective. And both of those are in favor of the state's case here. So the purpose of the law, the purpose of the law of the AWA is set forth in the text, and that is to ensure the humane treatment of animals. Yes, it involves interstate commerce. That's just the method whereby Congress, through its Article I powers, seeks to ensure that outcome of ensuring humane treatment of animals that are in commerce, being transported in commerce, kept as pets, which is a big focus. And so the Pups Act, which is what I'll call Maryland's law, is certainly consistent with that purpose. The purpose of the law was to eliminate the middle entities, middle men, middle people, whatever you want to call it, between the breeders who produce the dogs and the consumers who buy the dogs. Because what the legislature found or believed and believed was that when you go to a pet store, the pet store is obscuring the source of the dog. And so obviously you have a pet marketplace where you have breeders and brokers who sell to pet stores. When a consumer goes in a pet store, they don't know where that dog has come from, what conditions the dog was bred in, raised in, etc. They don't know whether that dog has been mistreated, whether that dog has had illnesses, or whether that dog will have behavioral issues. So the legislature believed that eliminating that obstacle would create a better consumer experience and be good for the humane treatment of dogs. Now that purpose is the same purpose as the AWA. So moving to the methods, when we look at the AWA, we aren't looking at a statute that is heavily regulating the sales and the actual commerce that people traditionally think of in dogs. What the AWA, its main purpose, is creating a licensing system for those entities, those breeders who wish to engage in interstate commerce. In other words, if these entities, if you wish to breed dogs that you wish to sell in interstate commerce, you need to be licensed. And what does that license do? Well, it purports to ensure that the breeding standards and the standards of the facilities are up to par, when in fact, as we've said in our briefing and as the legislature heard, that these AWA standards are really subsistence standards. These are a floor, a minimum standards to be applied. And so really the AWA, as the Second Circuit has indicated, is really just a system of licensing. If you want to be involved in interstate commerce, you have to be licensed. Now, what does the PUPS Act do? All it does is they require that if you want to buy a dog, pet stores can't sell dogs. And if you want to buy a dog, you have to buy it directly from the breeder. That does not affect one, interstate commerce, or two, the breeders ability to be licensed by the USDA. If they're large enough, remember under the AWA, you only need to be licensed if you have, I believe it's five or more breeding females. And so if you're that large and you want to sell into Maryland, you can get your USDA license. Nothing in the PUPS Act prevents a breeder from getting a license. So they work independently and in some ways complimentary. And all of this is without saying, without referring to sort of two clues in the text, and that's the savings clause and the other language, which says that the AWA expressly provides that the secretary of USDA is authorized to cooperate with state officials in carrying out the purpose of the AWA. So you have two clues that show that Congress certainly did not intend, whether field obstacle conflict express, did not intend to preempt state laws that are consistent with the purposes of the AWA. Moving to the dormant commerce clause, as this court knows, it's a two-tiered test. You have discrimination, whether it's facial in effect or purposefully. And then if none of those apply, then the pike balancing test. And I'll start with discrimination in purpose, because I think it really colors how this case is seen. The plaintiffs want to, or they've alleged that this is discrimination in purpose. In other words, that the Maryland legislature went out and with design to discriminate on the basis of interstate commerce. And nothing could be further from the truth. A review of the legislative history, and we've included from the 2018 law to the 2021 law, which is at issue here, that this is really about animal welfare, ensuring that consumers get healthy dogs, and that dogs are not bred in substandard conditions. You see it through the main legislator who sponsored the act and all of the animal welfare advocates that lobbied in support of the act. And I think it's important because when, and as we've said in our brief, we don't believe that purposeful discrimination is enough to have a violation of the Dormant Commerce Clause. Instead, what we look at when we look at purpose, legislative purpose, we look at it to contextualize another aspect of discrimination, whether it's the effects on interstate commerce or facially for that matter. And what we see in a lot of the case law is that the purpose, the court finds that the purpose of the law is, in fact, protectionist. And then they see that it was designed to be protectionist and that it is, in fact, protectionist. Here we have the opposite. You look at the purpose of the law. It is not a protectionist statute. And of course, that is what when we look to the framers and why they had the place, the commerce power in Article 1, we see that it was, that we see was to regulate, of course, indulgence. Sorry, Your Honor. But what we see is the purpose was to protect against protectionist legislation. And that's not what we have here. And so when we're looking at the law here, we can view it through the prism of there was certainly no intent to corner the market in dogs or to carve Maryland out as some sort of island of commerce that no one else can get to. And moving on to, excuse me, Your Honor, discrimination in effect. When we look at discrimination in effect, what we're looking at to see discrimination is we're looking at what must be shown as an distinction between in-state and out-of-state status. And we don't have that here. A breeder who's in Pennsylvania, who's in Virginia, who's in Delaware, who's in West Virginia, D.C., North Carolina, California, Missouri, et cetera, all of those breeders can sell into Maryland. There's nothing at the state line that adds a burden to them, that adds costs to them by virtue of the state law. And because you're not, Maryland did not legislate on the basis of state lines, and because every breeder in Maryland is treated. Your opponent says that might actually be evidence that the law has some sort of discriminatory purpose, perhaps that it's not because you can, you know, buy a dog on the internet from California and have it shipped to you in a crate across the country. You know, that the purpose, you know, it makes us suspicious about what was this really about protecting puppies from substandard conditions, or was it about something else? I think that's just the nature of the law. And as the Supreme Court has recognized, when you're dealing with an issue, you don't need to regulate comprehensively. You can work issue by issue or problem by problem. And certainly this is a problem that's dynamic and that required a sort of nuanced solution in this way, because the main sponsor of the act did recognize that you can buy from any breeder you want. And that's sort of involved. And it also was to sort of preserve the national marketplace or the state marketplace that is preserved under the law. Because an important aspect to this is that breeders in Maryland are limited in the same way that breeders out of state are limited. They must sell from their premises where the dogs were born and bred. So a breeder in Southern Maryland is close to Southern Maryland, but they aren't close to people in consumers in Northeast Maryland, Western Maryland, or the Eastern Shore. But a breeder in lower Pennsylvania disagree with you. The complaint allegations of the complaint disagree with you on this, right? Is that correct? I'm sorry, Your Honor, in what capacity? The complaint allegations of the complaint are contrary to what you're telling us about the out of state breeders. That out of state breeders are able to sell into Maryland? I said the complaint disagrees with you. Allegations of the complaint. And my apologies, Your Honor, it disagrees in what in what aspect? I'm asking you, I'm just asking you doesn't the complaint, the allegations of the complaint disagree with you as to out of state breeders? I don't believe it does. I think that they recognize that they are able to sell into Maryland. The breeder at issue in this case is from Missouri. And the breeder from Missouri alleges, and the state really doesn't have any take any issue with the fact that it may be more expensive to ship a dog from Missouri to Maryland than it would be from within the borders of but the linchpin is if it's not different for a breeder in Pennsylvania, Virginia, West Virginia, Delaware, DC, then you don't have an interstate commerce problem. You may have a long distance commerce problem. But again, as we've mentioned, the Constitution doesn't protect against or it's not the long distance commerce clause, but it's the interstate commerce clause. And so that's that's the linchpin is state lines. And if you have a system whereby a breeder, an entity in Pennsylvania can serve Maryland customers better than a Maryland entity in some other part of the state can serve those same customers, if we're relying just on on shipping costs and those logistical issues, then you don't have an interstate commerce problem. And you don't have you don't have effects on commerce that are constitutionally cognizable. Because certainly we can't take issue with the fact and their allegations. So we doubly can't take issue with the fact that Missouri, the Missouri breeder is going to have more expenses or different expenses than someone who's more local. But those just simply aren't significant for constitutional purposes. And with regard to Pike, it's the really the same analysis at the at the at the front of it, because Pike is a balancing test between burdens on interstate commerce, and then putative local benefits, and again, putative local benefits. And so when we look at the burdens, the burdens are really non existent or minimal at best. And so when you're balancing nothing against punitive benefits, the punitive benefits are going to win. And again, this is rational basis review when we're talking about the punitive benefits. So we look at the the benefits of, you know, removing that obstacle between the sourcing of the law. And yes, so those questions that relate to, is this a wise law? Is this won't this have in certain circumstances, the opposite effect? Or could this have the opposite effect? But those aren't questions for for for courts. Those are questions for the representative institutions like the Maryland Legislature or Congress, if they so chose to step in, because Congress could step in and say that this needs to be a national market, but they haven't done so. And so Maryland remains free. You're saying in Pike balancing, when we balance the actual evidence of discriminatory effects against not the actual evidence that the law will accomplish its purpose, but just the what the legislature said they thought it would accomplish, but we don't think about whether they actually designed a law to do what they thought it should do. Well, I think the way the way I'll answer that is I think that it highlights the what we've seen with problems with the Pike test. As Justice Scalia famously said, it's like judging whether three apples are the same as six tangerines. Right, but the Supreme Court has told us to try. It's a we don't get to just say, you know, we think it's a real bad idea. We have to, you know, they haven't eradicated it yet. And I just wanted to nail down this. You talk about putative, you know, purposes, and you may be right that we were supposed to take what the legislature said they were going to do. And we take that purpose at face value. Your opponent says, Well, I'd like to get some evidence about that and see whether it's actually fulfilling those purposes or not. But, you know, is that relevant to the question that we are supposed to be resolving and balancing? Yeah, I don't think so. I think if there is discovery to be had under a Pike balancing test, it really, excuse me, relates to the effects side of the equation. Because otherwise, you would undo the notion that that the putative benefits analysis is similar to rational basis. Because now you're getting into intermediate scrutiny, where the state has to advance evidence, empirical evidence in support of we judge the state, we judge the state's purposes based on the evidence it had in front of it when it decided to enact the law, right? If the state's informed this XYZ is a problem, we think that, you know, these particular legislative proposals are a way to address that problem. We look at what the legislature had in front of it, not what happened the year after they enacted the law or two years after five years after to see if it actually shook out the way they thought it would. Well, that would be like rational basis, right? We look at what did they have? What basis did they have at the time? I mean, even on a rational basis, you can look at what they look at anything you can look at theoretically, you can make you can sort of do the work for them, if you will, obviously, that didn't need to happen in this case, because the court or the legislature had testimony in front of it, it had arguments, it had advocacy in front of it, that was saying that if you enact these laws, they will have these particular effects, and they will affect these market participants, but not these market participants. And you can still get a dog from California or Pennsylvania, out of state, if you chose to do so, or you could get a dog in Maryland that that market would not be affected. So I think if there's, we have to treat the punitive benefits under a rational basis, sort of evidence is not significant or dispositive in that. Now, the extent that there is discovery in a pipe balancing analysis, it does relate to the economic impact or the effects on interstate commerce. And, you know, Judge King, you asked the question about what type of discovery, I still think that it's an open question as to how the plaintiffs in this case, what is, in fact, the question presented, that if you were writing a report, this is the question that we need to answer. And, and if, and even looking beyond that, why couldn't that information, why does a court need to sanction that type of discovery? In their brief, they talk about that, they sort of concede that they don't need discovery from the state, from the state of Maryland. And they, they hint that they might need information or discovery from third parties, but they don't identify at all what those third party, what that third party evidence would be, or how that discovery would look like, and sort of what. They have to tell you all that now, they would really, what they have to do is make allegations in the complaint that we take as true. And based on that, we decide whether Bill B-6 was proper. Well, I, I, I agree with you. I, I think at this stage, I think if they- Bill B-6, that's, and so the, you have to accept the well-pleaded facts in the complaint. Right, but you have to, I think that it's, the burden is, is on the plaintiffs in a what they are trying to show and how they would show it, how they get from A to B to, to break it down. And I see my time is up, or about to be up, and I'm happy to answer any other questions. If not, thank you for your time. Thank you very much, sir. Good to have you with us. Ms. Borgeson, you've got some rebuttal time. Thank you, your honors. To touch briefly on the state's preemption argument, the Savings Clause does allow states to promulgate standards in addition to those promulgated by the USDA. That's what Maryland did in 2012 and 2016, when it added increased record keeping and health standards for those retail pet stores, as far as their sourcing requirements. But a USDA broker, specifically, they could get a USDA license, they can follow their additional standards set forth by their home state, yet they cannot conduct business within Maryland. It is impossible for a Class B dealer to conduct business in Maryland. And it's impossible for an out-of-state Class A breeder to conduct business in Maryland, except for the one Class A USDA licensed breeder that is located within the state of Maryland. That is an interference with Congress's methods and purpose, as set forth in international paper, Supreme Court case. And that is the crux of Appellant's arguments regarding preemption. Switch briefly to the Dormant Commerce Clause arguments. To touch on purpose, the Backus Imports case, another Supreme Court case, did state clearly that finding of discrimination can be found on purpose or discriminatory effect. So I do believe it is within the court's discretion to find that solely because this law discriminates in its purpose, it should be found a violation of the Dormant Commerce Clause. And the true purpose of Maryland's ban, as made clear in the legislature and the prior iteration of the ban, is to remove Maryland from the national marketplace of pet sales in retail pet stores by taking away those out-of-state breeders and brokers ability to engage in the face-to-face sales within the state of Maryland to the benefit of the golden retrievers of Timonium or poodles of Salisbury, as the legislature stated. The state argued regarding discriminatory effect that there is no feature distinguishing out-of-state versus in-state status, which again, we disagree. The only way, again, for an out-of-state breeder to sell in the state in those face-to-face sales is to buy a plot of land within the state of Maryland, which is specifically what the Supreme Court has cautioned against in these types of interstate commerce issues, and that's a Granholm case. Regarding the Pike analysis, very briefly, Your Honors, I believe that the court needs to look at both the burdens and local benefits, not just the burdens on interstate commerce when doing the it's a balancing test. In Hazel 1 before this court, this court stated that speculative benefits will not pass muster, so the court needs to look at those benefits. Are they speculative? Are those local benefits speculative? And as alleged in our complaint, they are certainly speculative, and they're false, and that's why opponents are seeking the opportunity to move beyond the it's possible in a hypothetical case to grant 12B6 relief, even if you have a Pike balancing argument. I mean, a court can look at a complaint and say, even accepting as true all the discriminatory effects you're alleging and the sort of purpose of the statute, it still wouldn't shake out in your favor. Could a court do that in a hypothetical case? Yes, Your Honor, I believe that a court could do that, but in this case, our complaint is quite robust. We make numerous allegations regarding the heightened increased costs for the wealthy Maryland consumer to travel to the Missouri breeder to purchase their dogs or the interstate problem, right? Like that it's going to hurt Maryland consumers. It would hurt Maryland consumers, but on the other hand of that, or on the other side of that, those out-of-state breeders would also need to cover or pay for the transportation of those animals within the state. So the point of sale would occur outside the state, and then those we've alleged that there is heightened or extremely high cost for animal transportation even beyond the sale. I think it costs upwards of $1,000 to get an animal or a dog to be flown into the home state following the purchase. So that record has been developed in the complaint, and we feel was enough to get beyond the motion to dismiss stage in a pike balancing analysis. We'd ask that the court reverse the lower court's decision and remand either with a direction to invalidate the statute for discriminatory purpose, effective preemption, or at least to allow the case to proceed in discovery. Thank you, Your Honors. Thank you. Thank you both. We appreciate your submissions and your arguments. And with that, we will take your case under advisement. If you were here, we'd reach you personally if we didn't have the restrictions foisted upon us by the pandemic. And with all that said, Madam Clerk, we will adjourn court until later this afternoon. This honorable court stands adjourned until this afternoon. God save the United States and this honorable court. Court. Court. Court.
judges: Robert B. King, Allison J. Rushing, William B. Traxler Jr.